T. Paul Kane, J.
Subdivision 2 of section 701 of the Education Law of the State of New York was amended by chapter 320 of the Laws of 1965 to become effective September 1, 1966. It provides as follows: ‘ ‘ 2. In the several cities and school districts of the state, boards of education, trustees or such body or officers as perform the function of such boards shall have the power and duty to purchase and to loan upon individual request, to all children residing in such district who are enrolled in grades seven to twelve of a public or private school which complies with the compulsory education law, textbooks. Textbooks loaned to children enrolled in grades seven to twelve of said private schools shall be textbooks which are designated for use in any public, elementary or secondary schools of the state or are approved by any boards of education, trustees or other school authorities. Such textbooks are to be loaned free to such children subject to such rules and regulations as are or may be prescribed by the board of regents and such boards of education, trustees or other school authorities.”
The significant portion of this amendment is, of course, the requirement that school districts must purchase textbooks for pupils enrolled in grades 7 to 12 of a public or private school which complies with the compulsory Education Law. Plaintiffs are the Board of Education of Central School District No. 1, Towns of East Greenbush, Nassau, Schodack, Sand Lake and North Greenbush, Rensselaer County, and Chatham, Columbia County, and also the Board of Education of Union Free District *299 No. 3, Towns of North Hempstead and Oyster Bay, Nassau County, New York, pursuant to a stipulation of the parties and an order of this court. Said plaintiffs, hereinafter known as “Greenbush Board ” and “ Roslyn Board ” respeetively, bring an action against James E. Allen, Jr., as Commissioner of Education of the State of New York, and seek a judgment declaring the above-mentioned portion of chapter 320 of the Laws of 1965 unconstitutional and void and to restrain the defendant from appropriating any money for the purposes of said section or any other action in regard thereto. Heretofore parents of certain pupils, residents of plaintiff’s Greenbush Board District, who attend private schools and who are entitled to the benefits proposed by the statutory provision under attack, have been granted leave to intervene by order of the court. They shall hereinafter be identified as “ intervenor-defendants
The defendant Commissioner has moved to dismiss the complaint, or in the alternative for judgment declaring the statute in question in all respects constitutional and valid. Intervenordefendants make a similar motion and the plaintiffs cross-move for summary judgment for the relief demanded in the complaint. There is thus before the court the determination of the constitutionality of a State statute. The answer of the defendant Commissioner contains five separate affirmative defenses, the third of which questions the plaintiffs’ standing to bring such an action against the State or an officer thereof, and also the plaintiffs’ capacity to question the constitutionality of a State statute. Obviously a disposition of this defense must be made before there can be any consideration of the merits of the action.
To this court the matter of status or standing is not clear-cut. Granted there is apparent substantial authority prohibiting a municipality or agency of the State from challenging a State statute (Black Riv. Regulating Dist. v. Adirondack League Club, 307 N. Y. 475), but the rule could be subject to some conditions and limitations, which appear particularly appropriate in the pending matter. A school district and its Board of Education is more than a mere agent of the State. It is an entity performing a State purpose pursuant to the mandate of the People as directed by their Constitution. (N. Y. Const., art. XI, § 1; Education Law, § 2, subd. 14; Matter of Divisich v. Marshall, 281 N. Y. 170.) The fulfillment of its purpose requires considerations that exceed the powers of a regulating district as prescribed in the Black Riv. ease (supra). This distinction is recognized by the statutory definition of defendant’s powers which refer to the Commissioner’s advice and guidance to the school officers of all districts of the State in relation to their *300 duties and the general management of the schools under their control ”. (Education Law, § 305, subd. 2.) Among these duties is a requirement" to comply with the provisions of the Education Law. If, however, the Board of Education, as evidenced by this action, concluded that they were being compelled to perform an unlawful act, what is their remedy? Certainly they should have the right to properly litigate any question affecting the performance of their duties. “ A grant to school organizations of- the power to maintain actions implies a legislative intent that such organizations should prosecute any actions they might deem necessary for the protection; and preservation of school funds and property.” (79 C. J. S., Schools and School Districts, " § 429.)
The members of a Board of Education should not, as an alternative, be subjected -to a removal statute. (Education Law, § 306.) Furthermore, they should not be required to perform ■ and be met with a taxpayer’s action. As an additional impediment to access to the courts, there is considerable authority for the position that such an action would not lie under section 51 of the General Municipal Law, since it has been held that a school district is not a municipal corporation. (General Municipal Law, § 2; Brooks v. Wyman, 220 App. Div. 204, affd. 246 N. Y. 534; Johnston v. Gordon, 247 App. Div. 40.) An action brought by a resident of the district as a taxpayer, would be met with the identical barrier offered as defendant’s third affirmative defense. (St. Clair v. Yonkers Raceway, 13 N Y 2d 72; Bull v. Stichman, 273 App. Div. 311, affd. 298 N. Y. 516.) While there may be historical and practical considerations for the rule as established, there" are graver and more disturbing problems created by a broad application thereof. Specifically, can these ■ plaintiffs in- effect be foreclosed from access to the courts ? To pursue the-matter further, an extension of this rule will eventually not only restrict the court in, but effectively prohibit it ■ from, the performance of its function in the balance of power structure as a third arm of our government. This power in the court to strike down a statute as unconstitutional belongs to the People, and while it requires the imposition of limitations and restraints, certain flexibility should also exist in order to avoid an unjust-result. In other words, this power in the courts is so basic that a denial of it to the People could, per se, be a violation of a constitutional right. (U. S. Const., 14th Amdt., § 1; City of Buffalo v. State Bd. of Equalization & Assessment, 26 A D 2d 213, citing Matter of Bond & Mtge. Guar. Co., 249 App. Div. 25, affd. 274 N. Y. 598.) Therein a County Clerk questioned the constitutionality of a- State statute that required him to exempt *301 certain corporations from the payment of fees. The court rejected his argument holding that compliance with the statute did not affect his rights as a County Clerk. “ ‘ The constitutional guaranty does not extend to the mere interest of an official, as such, who has not been deprived of his property without due process of law or denied the equal protection of the laws. (Columbus & Greenville R. Co. v. Miller, 283 U. S. 96.) ” (p. 27; emphasis supplied). This rule would also apply to plaintiffs, since a denial of access to the courts may well contravene their constitutional rights. Furthermore, under such circumstances consideration should be given to the position of the resident district taxpayer, not a party to this proceeding, if his constitutional rights may be impaired. (United States v. Raines, 362 U. S. 17, 23.)
As a result, the court, for the reasons stated, finds that these plaintiffs do possess the necessary standing to maintain the within action. The third and fourth affirmative defenses set forth by defendant cannot be sustained, the first affirmative defense has been rendered moot by an amendment to the complaint, the second and fifth affirmative defenses are without foundation.
Thus the court reaches the merits of the controversy upon these motions. The Constitution of the State of New York (art. XI, § 3) provides as follows: “ Neither the state nor any subdivision thereof shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught, but the legislature may provide for the transportation of children to and from any school or institution of learning.” (Formerly section 4 of article IX, renumbered and amended by Constitutional Convention of 1938; approved by the People Nov. 8,1938.)
It would seem that the statute under attack contravenes this provision of the Constitution (art. XI, § 3). It was so held by the courts of this State some years ago when a similar statute was rendered unconstitutional in Smith v. Donahue (202 App. Div. 656). In that case the implementation of the statute involved the purchase of textbooks and school supplies for parochial schools directly rather than loan upon request by the student of such schools. Therein, as in the case before this court, the question of the ‘ ‘ pupil benefit theory ’ ’ was argued, requiring a determination herein as to whether the Smith ease can be considered precedent. It should be noted, when discussing *302 a provision for supplies running directly to the school, the court said (p. 664): “ These supplies are to be furnished in the same manner and to the same party as textbooks. It seems to us to be giving a strained and unusual meaning to words if we hold that the books and the ordinary school supplies, when furnished for the use of pupils, is a furnishing to the pupils and not a furnishing in aid or maintenance of a school of learning. It seems very plain that such furnishing is at least indirectly in aid of the institution and that, if not in actual violation of the words, it is in violation of the true intent and meaning of the Constitution and in consequence equally unconstitutional.”
Earlier the court set forth its definition of a school district and its component parts (pp. 663-664): “A school district is a district of and for the public schools; it was organized here as such and exists as such. The school is not the building and its equipment; it is the organization, the union of all the elements in the organization to furnish education in some branch of learning— the arts or sciences or literature. It is the institution, and the teachers and scholars together, that make it up. The pupils are part of the school.”
It would seem, at least, the court had in mind a rejection of what is referred to as the “pupil benefit theory ”. Of course this theory was later advanced in Judd v. Board of Educ. (278 N. Y. 200) and specifically rejected by the Court of Appeals. The substance of this decision was the unconstitutionality of the public transportation of students to parochial schools, which shortly thereafter was provided for by constitutional amendment. (N. Y. Const., art. XI, § 3.) There is no indication nor can this court find any authority for the proposition that this constitutional amendment ratified the child benefit theory after its rejection in the Judd case. Matter of Zorach v. Clauson (303 N. Y. 161) cited by defendant and intervenor-defendants, does not sustain their position. Therein an unsuccessful attack was made upon the “ release time ” program (Education Law, § 3210, subd. 1). However, the thrust of the argument was directed at section 3 of article I of the New York Constitution rather than section 3 of article XI. It should be noted, however, that the court, in referring to the matter of released time observed (p. 169): “In the instant case, there is no ‘ use ’ of tax-supported ‘ property or credit or any public money ’ ‘ directly or indirectly ’ ‘ in aid or maintenance ’ of religious instruction (People ex rel. Lewis v. Graves, 245 N. Y. 195, 198 * * *) ”. It would seem, at least by implication, that what was not found objectionable in Matter of Zorach v. Clauson (supra) may be present in the matter at hand. A history of this *303 issue in the State of New York compels one conclusion.: we are squarely facing a constitutional prohibition. The court is little troubled in perceiving this prohibition in section 3 of article XI of our State Constitution, with due consideration for and acknowledgment of the strict rules applicable to those who question the constitutionality of a State statute including, but not limited to, the rule that unconstitutionality must be demonstrated beyond a reasonable doubt. (Wiggins v. Town of Somers, 4 N Y 2d 215.)
However, the court is somewhat hazy in perceiving the atmosphere created by recent decisions in the Supreme Court of the United States under the First Amendment made applicable to the States by the Fourteenth Amendment (Cantwell v. Connecticut, 310 U. S. 296), and their effect upon the efficacy of this State statute under attack. It is even difficult to find a point of departure. However, it would seem that the more recent decisions properly define the mode of thinking regarding the applicable portions of the First Amendment (Engel v. Vitale, 370 U. S. 421; Abington School Dist. v. Schempp, 374 U. S. 203). The specific words of the First Amendment are: “ Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof ”. A reading of the above-mentioned cases makes it difficult to conclude that the statute in question is not in violation of both the establishment clause and the free exercise clause. This becomes even more obvious if the effect of the implementation of this statute is projected to the point where parents of students at private schools begin to rely upon the assistance of public moneys for textbooks, and private schools anticipate this reliance in the preparation of their budgets. If the textbooks provided at some subsequent time become unacceptable or even arguable as offensive to private schools, is there some form of financial compulsion present that would affect a purportedly voluntary decision by either a . parent or a representative of a private school? Mathematics texts, mentioned in oral arguments of counsel, perhaps present no problem, but what of history, science or social studies in general that are or will be part of a public school curriculum. Might this program prelude potential interference in a private school program, or might it precipitate the commingling of private and public school programs to the extent that each would ultimately compromise basic principles for financial or academic expediency. Broader implications of these thoughts are found in the concurring opinion of Mr. Justice Brennan in Abington School Dist. v. Schempp (supra, p. 242): “ The relationship of the Establishment Clause of the First Amendment to the public *304 school system is preeminently that of reserving such a choice to the individual parent, rather than vesting it in the majority of voters of each State or school district. The choice which is thus preserved is between a public secular education with its uniquely democratic values, and some form of private or sectarian education, which offers values of its own. In my judgment the First Amendment forbids the State to inhibit that freedom of choice by diminishing the attractiveness of either alternative — either by restricting the liberty of the private schools to inculcate whatever values they wish, or by jeopardizing the freedom of the public schools from private or sectarian pressures. The choice between these very different forms of education is one — very much like the choice of whether or not to worship — which our Constitution leaves to the individual parent. It is no proper function of the state or local government to influence or restrict that election. The lesson of history — drawn more from the experiences of other countries than from our own — is that a system of free public education forfeits its unique contribution to the growth of democratic citizenship when that choice ceases to be freely available to each parent.”
These implications are further advanced in the concurring opinion of Mr. Justice Douglas in the same case (pp. 229-230):
‘ ‘ But the Establishment Clause is not limited to precluding the State itself from conducting religious exercises. It also forbids the State to employ its facilities or funds in a way that gives any church, or all churches, greater strength in our society than it would have by relying on its members alone. Thus, the present regimes must fall under that clause for the additional reason that public funds, though small in amount, are being used to promote a religious exercise. Through the mechanism of the State, all of the people are being required to finance a religious exercise that only some of the people want and that violates the sensibilities of others.
“ The most effective tv ay to establish any institution is to finance it; and this truth is reflected in the appeals by church groups for public funds to finance their religious schools. Financing a church either in its strictly religious activities or in its other activities is equally unconstitutional, as I understand the Establishment Clause. Budgets for one activity may be technically separable from budgets for others. But the institution is an inseparable whole, a living organism, which is strengthened in proselytizing when it is strengthened in any department by contributions from other than its own members.
“ Such contributions may not be made by the State even in a minor degree without violating the Establishment Clause. It *305 is not the amount of public funds expended, as this case illustrates, it is the use to which public funds are put that is controlling. For the First Amendment does not say that some forms of establishment are allowed; it says that ‘ no law respecting an establishment of religion ’ shall be made. What may not be done directly may not be done indirectly lest the Establishment Clause become a mockery.”
The court is aware of the implications contained in these views as they may affect many Federal and State programs in aid of students attending private educational institutions under religious auspices. However, it is this court’s duty, as it sees it, to determine the specific question before it based upon what it believes to be the law.
Accordingly, for the reasons stated, the motions of the defendant and intervenor-defendants are denied, and the cross motion of the plaintiffs for summary judgment is in all respects granted, each without costs.